UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lance Schultz,

                Plaintiff,            **MEMORANDUM OPINION AND ORDER**

v.                                        Civil No. 14-1096 ADM/JJK

Soo Line Railroad Company
d/b/a Canadian Pacific Railway,

                Defendant.

---

Timothy M. Phillips, Esq., Joshua R. Williams, PLLC, Minneapolis, MN, on behalf of Plaintiff.

Tracey H. Donesky, Esq., Stinson Leonard Street LLP, Minneapolis, MN, on behalf of Defendant.

---

## I.  INTRODUCTION

On June 25, 2015, the undersigned United States District Judge heard oral argument on Defendant Soo Line Railroad Company d/b/a Canadian Pacific Railway's ("Soo Line") Motion for Summary Judgment [Docket No. 22]. Plaintiff Lance Schultz ("Schultz") asserts claims for violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54, and the Minnesota Whistleblower Statute, Minn. Stat. § 181.932(1). For the reasons set forth below, Soo Line's motion is granted.

## II.  BACKGROUND

### A.  Parties and the FLM Training Team

Soo Line provides freight rail transportation services in several states including Minnesota. Cobb Decl. [Docket No. 28] ¶ 3. Soo Line is a wholly owned U.S. subsidiary of the Canadian Pacific Railway Company ("CP"), whose headquarters are in Calgary, Canada. Id.

Schultz began his employment with Soo Line in March 2012 as a Frontline Manager Trainer ("FLM Trainer"). Phillips Decl. [Docket No. 36] Ex. 2. Schultz's primary duty as a FLM Trainer was to train frontline managers (trainmasters, assistant trainmasters, and general managers) on the use of Soo Line's computer applications at CP sites in the United States and Canada. Donesky Decl. [Docket No. 32] Ex. A ("Schultz Dep. I") at 207–08. During Schultz's period of employment, the FLM Trainer team was comprised of approximately 10–12 individuals. Schultz Dep. I at 47. Only Schultz was based in the United States; the remainder of the FLM Trainers were based in Canada. Phillips Decl. Ex. 1 ("Schultz Dep. II") at 319. Unlike most of the FLM Trainers, Schultz had no prior experience in the railroad industry or with railroad operations. Schultz Dep. I at 159, 205, 215. He was also the least senior employee on the FLM Trainer team. Id. at 206.

The FLM Trainers primarily provided "over-the-shoulder" training to frontline managers, meaning that training was provided to the managers while the managers were performing their duties at their desks. Id. at 106. At busier rail yards, managers were trained away from their desks. Id. at 107. When FLM Trainers were not training managers, the trainers were expected to be at their computers to answer emails, phone calls, and instant message questions from employees. Id. at 107–08.

From March 2012 to November 2013, the FLM Training team was supervised by CP manager Lucky Strauss ("Strauss"). Strauss Decl. [Docket No. 29] ¶ 2. Strauss served as Schultz's direct supervisor during this time. Id. After Strauss transferred to a different position in December 2013, Greg Burley ("Burley") began managing the FLM Training team. Burley Decl. [Docket No. 30] ¶ 2.

**B. Schultz's Job Performance**

Schultz's position required 100% travel on seven work days in a row, followed by seven days off. Schultz Dep. I at 6–7. Schultz typically traveled on Mondays and returned home on Sundays. See Burley Decl. Ex. A. Although he traveled on Sundays, Schultz was expected to complete several hours of scheduled work at the rail yard on those days before leaving to travel home. See id.

In April 2013, Strauss reviewed Schultz's travel itineraries and discovered multiple instances of Schultz leaving to travel home before completing his scheduled work hours. Strauss Decl. ¶ 4; Donesky Decl. Exs. B–F. In an April 4, 2013 email, Strauss told Schultz that "[y]ou cannot go and make your own hours. It's inaccurate (from my standpoint as I show coverage in a yard you didn't even go in that day) and unfair to the other trainers within the team." Donesky Decl. Ex. F. Strauss instructed Schultz to send his future travel itineraries to Strauss for the next few months. Id. Schultz failed to comply with this requirement on multiple occasions. Schultz Dep. I at 254–56; Donesky Decl. Exs. G–I.

In July 2013, Strauss conducted a mandatory performance review with Schultz. Schultz Dep. I at 259. In the review, Strauss addressed several items of concern with Schultz, including issues of trust, reliability, inappropriate booking of flights, not providing itineraries, and unauthorized leave from his work location. Donesky Decl. Ex. H; Schultz Dep. I at 260–61. Strauss informed Schultz that this was unacceptable. Donesky Decl. Ex. H; Schultz Dep. I at 260. Strauss also raised her concern over an incident where Schultz took a dinner break instead of helping to locate a lost rail car containing hazardous materials. Donesky Decl. Ex. H; Schultz Dep. I at 261.

On October 31, 2013, when visiting a control tower, Strauss discovered that Schultz was temporarily missing from his assigned post. Schultz Dep. I at 288. That same day, Strauss reprimanded Schultz for not being available online to answer questions from trainmasters at other locations. Id. at 285–286; Donesky Decl. Ex. M.

On September 12, 2013, nearly two months before requesting FMLA leave, Schultz acknowledged that Strauss was consistently dissatisfied with his performance, stating in an instant message to a colleague: "[t]he only time I hear from Lucky at all its [sic] never good." Wahl Decl. [Docket No. 31] Ex. A.

**C. The FLM Training Team's Change in Focus and Restructuring**

On June 16, 2013, Strauss notified the FLM Training team by email that Soo Line would be shifting away from on-site training at managers' desks and placing more emphasis upon classroom instruction. Phillips Decl. Ex. 5. Strauss wrote "I think we all agree that time away from the desk and classroom training is the way we want to proceed going forward" and that "it is our goal to finish locations by the end of this year." Id. Strauss discounted the notion that the FLM Trainers would be eliminated altogether but did state that the "team will definitely still exist . . . . it may look a bit different ie. LESS travelling [sic] more classroom etc. . . ." Id. (ellipses and emphasis in original).

At the time the email was sent, Schultz was already aware of the impending changes and had expressed concern to coworkers that his position would be eliminated. In a June 15, 2013 instant message to a colleague, Schultz stated: "I have no place in this company to go back to[.] There r not enough people to train in the states to have me sit on the payroll to teach a class once a month or less[.] I have not been in on any classroom planning or prep stuff, I think I know

where I stand[.]" Wahl Decl. Ex. B. at CPLS 0001578. On the same day, Schultz emailed another coworker, stating: "Not enough work. They don't have enough new employees to keep me on every week. They will fly someone else in." Id. Ex. C. When the email recipient accused Schultz of being a "dark cloud," he replied, "Not being dark, just realistic." Id. Schultz began applying for jobs outside of Soo Line in August 2013. See id. Ex. F. He continued to search for new employment even after his FMLA leave began on November 11, 2013. See id.

Although Schultz had known since at least June 2013 that focus of the FLM Training team was shifting from "over-the-shoulder" training at managers' desks to classroom training, Schultz informed Strauss in October 2013 that he was not comfortable conducting classroom training sessions on his own and stated that he would prefer to teach classroom sessions with the support of another trainer. See Donesky Decl. Ex. K; Burley Decl. Ex. C.

In addition to restructuring where the FLM Training team conducted training, the substance of the training also changed. By January 2014, the FLM Training team no longer trained employees on systems, and instead trained employees how to run a rail yard. Burley Decl. ¶ 4; Ex. B. Schultz acknowledges that he was one of only two trainers who did not have prior railroad experience. Schultz Dep. I at 105, 205, 272.

**D. Schultz's FMLA Leave and Termination**

On November 6, 2013, Schultz's physician recommended Schultz take leave for anxiety he was experiencing. Donesky Decl. Ex. Q. Soo Line approved Schultz's FMLA leave beginning on November 11, 2013 for an unspecified period of time. Id. Ex. R; Phillips Decl. Ex. 27. Schultz admits he received all of the FMLA leave he sought, during which time he continued to receive employment benefits. Schultz Dep. I at 298-99.

On January 10, 2014, Soo Line's General Manager of Operation Performance, Jeff Edwards, asked Burley and Strauss in an email for an overview of Schultz's situation. Phillips Decl. Ex. 11. Burley replied: "There were some performance issues and Lucky put pressure on him to improve. He then went off on stress leave." Id. Edwards responded: "Do we have any options with a person like this? I am assuming I can't now let him go for performance issues?" Id.

In late January 2014, Burley recommended releasing Schultz based on his poor job performance and the concern that Schultz lacked the skill set needed to perform the FLM Training team's new role of training employees to properly run a rail yard. Burley Decl. Ex. D. Burley recommended that Schultz's position not be refilled and that the TLM Training team be reduced from 8 to 7 positions. Id.

On February 10, 2014, Schultz returned to work from his FMLA leave. Phillips Decl. Ex. 18. In a letter from Burley to Schultz dated February 13, 2014, Schultz was informed of his department's restructuring and notified of his termination. Phillips Decl. Ex. 19 at 1-2; Schultz Dep. I at 318-20. The letter stated that Schultz's position was "being eliminated due to a reduction in force/restructuring in the US Operations Analysis Department." Phillips Decl. Ex. 19 at 1. On an application for unemployment benefits to the Railroad Retirement Board dated March 31, 2014, Schultz listed as the reason he was no longer working, "position eliminated due to restructuring." Donesky Decl. Ex. Z at 1.

Schultz's position was not re-hired following his termination. Burley Decl. ¶ 8. In the time since Schultz's departure, three additional trainers have left the FLM Training team and have not been re-hired. Id. The FLM Training team presently consists of four trainers. Id.

**E. Claims Being Asserted**

Schultz's Complaint asserts multiple claims arising under the FMLA and the Minnesota Whistleblower Statute. Schultz concedes the dismissal of all but one claim, whether the "Defendant violated the FMLA by terminating plaintiff in retaliation for his exercising her [sic] rights under the FMLA." Compl. ¶ 26.

## III.  DISCUSSION

**A. Summary Judgment Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. <u>Ludwig v. Anderson</u>, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. <u>Id.</u> However, "the

mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).  Moreover, a plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." Rath v. Selection Research, Inc., 978 F.2d 1087, 1091 (8th Cir. 1992), (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." Krenik, 47 F.3d at 959.

**B.  FMLA**

The FMLA entitles eligible employees to up to twelve weeks of leave in a twelve-month period when they have serious health conditions that make them unable to perform their work functions. 29 U.S.C. § 2612(a)(1)(d); Spangler v. Fed. Home Loan Bank of Des Moines, 278 F.3d 847, 851 (8th Cir. 2002).  The Eighth Circuit recognizes three types of FMLA claims, interference, retaliation, and discrimination. Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir.2012).  At issue here is a discrimination claim, which arises when an employer takes adverse action against an employee after an exercise of FMLA rights. Id. at 1005.

Since Schultz has not presented direct evidence of discrimination, his FMLA claim is analyzed under the McDonnell Douglas[1] burden-shifting framework. Pulczinski, 691 F.3d at 1007.  The burden first rests on the employee to make a prima facie case of discrimination.  This

---

[1] 411 U.S. 792 (1973)

is accomplished by showing the employee engaged in activity protected by the FMLA, the employee suffered an adverse employment action, and that a causal connection exists between the protected activity and the adverse employment action.  Id.  If the employee can carry this burden, the burden shifts to the employer to articulate a non-discriminatory justification for the adverse employment action.  Wierman v. Casey's Gen. Stores, 638 F.3d 984, 999 (8th Cir. 2011).  If the employer offers such a reason, the burden shifts back to the employee to proffer evidence to "create a genuine issue of material fact whether [the] proffered explanation is merely pretext for unlawful" discrimination.  Id.

**1.  Causation Standard**

As a preliminary matter, the parties disagree over the causation standard that controls a FMLA discrimination claim.  The traditional burden in FMLA cases is the "motivating factor" test.  See Roberts v. Part Nicollet Health Servs., 528 F.3d 1123, 1127 (8th Cir. 2008) ("[T]he issue is whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action.").  Soo Line argues that the Supreme Court raised this burden to the "but for" standard when it held in University of Southwestern Medical Center v. Nassar, — U.S. —, —, 133 S. Ct. 2517, 2533 (2013), that "Title VII retaliation claims must be proved according to the traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions by the employer."

The effect of Nassar on non-Title VII actions remains uncertain.  The Eighth Circuit has not yet issued a decision addressing Nassar's impact, if any, on FMLA discrimination claims.  Circuit courts that have faced this issue have generally demurred in extending Nassar to FMLA

based claims.  See, e.g., Wanamaker v. Town of Westport Bd. of Educ., 11 F. Supp. 3d 51, 72–73 (D. Conn. 2014) (noting uncertainty with respect to Nassar's effect on FMLA retaliation claims); Chase v. U.S. Postal Serv., No. 12-11182, 2013 WL 5948373, at *9 (D. Mass. Nov. 4, 2013) (same); Nigh v. Sch. Dist. of Mellen, 50 F. Supp. 3d 1034, 1054 (W.D. Wisc. 2014) (same).

Here, the Court need not decide whether Nassar requires application of the higher "but for" standard of causation under the FMLA because even under the lower "motivating factor" standard, the record fails to create a genuine fact issue as to whether Schultz's adverse employment action was motived by his FMLA leave.

### 2. Non-Discriminatory Reason to Justify Schultz's Termination

Assuming that Schultz can establish a prima facie case of discrimination, Soo Line has presented evidence of a non-discriminatory reason for Schultz's termination:  the termination was the result of Soo Line restructuring its FLM Trainer team.  The burden to present a non-discriminatory reason is not onerous.  Arraleh v. Cty. of Ramsey, 461 F.3d 967, 975 (8th Cir. 2006).  Soo Line's justification for Schultz's termination is supported through communications Soo Line had with its FLM Trainers months before Schultz took FMLA leave, communications between Soo Line management discussing the changes to the FLM Trainer position, and the decision to ultimately terminate Schultz and not re-hire for his position.  Strauss Decl. Ex. F; Burley Decl. Ex. D.

### 3. Pretext

To sufficiently demonstrate Soo Line's proffered non-discriminatory justification is pretextual, Schultz must demonstrate Soo Line's conduct was motivated by retaliatory intent.

Burciaga v. Ravago Ams., LLC 56 F. Supp. 3d 987, 1002 (S.D. Iowa 2014) (citing Wierman, 638 F.3d at 999).  In determining whether an employer's proffered reason is pretextual, the Eighth Circuit has cautioned that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . .  Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."  Wilking v. Cty. of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998) (quoting Harvey v. Anheuser-Busch, Inc. 38 F.3d 968, 973 (8th Cir. 1994) (quotations omitted)).

Schultz raises several arguments asserting that Soo Line's proffered reason is pretextual, but none are sufficient to create a triable issue on pretext.

### a. Inconsistent reasons for discharge

Schultz first argues that Soo Line has proffered inconsistent reasons for his termination.  Schultz argues that Soo Line first explained his termination as the product of company restructuring.  Later, argues Schultz, Soo Line changed tack, stating that Schultz was terminated for performance issues.

Inconsistent reasoning for an employee's discharge can be sufficient to create a triable issue of fact.  Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1023 (8th Cir. 1998).  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is . . . cover[ing] up a discriminatory purpose."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).  "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."  Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir. 1994).

As evidence of inconsistency, Schultz cites an email from Burley to the FLM Trainer

11

team that states Schultz was released "solely" because of the elimination of his position. Phillips Decl. Ex. 24. Schultz argues that Soo Line now asserts that Schultz was instead terminated for performance reasons. However, these two reasons are not inconsistent, as performance issues are legitimate justifications used in reduction in force determinations. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 774 (8th Cir. 1995) (noting employer's Relative Assessment Scoring program used to evaluate employee performance to effectuate the employer's employee-reduction goal). Additionally, Soo Line's documented restructuring was anticipated to place more emphasis on classroom training, a context where Schultz had sought extra assistance. Soo Line's proffered reason for Schultz's termination and later references to his performance record are not evidence of substantial equivocation or falsity.

Even if viewed in a light most favorable to Schultz, this evidence fails to demonstrate Soo Line's proffered reason has substantially changed over time. When Schultz was given notice of his termination on February 13, 2014, he was informed that it was motivated by a reduction in force or restructuring. Id. Ex. 19. Although Schultz's performance issues were raised by management when discussing Schultz's situation, the primary reason stated by Burley for Schultz's termination was because of the restructuring of the FLM Trainer positions. See Burley Decl. Ex. D (noting Schultz's performance issues and stating "[w]ith the upcoming changes to the Training Team, . . . [Schultz's] skillset [sic] will not be adequate for the role. . . . There will be no need in the near future to fill [Schultz's] position and the team will be reduced from 8 to 7 positions."); Phillips Decl. Ex. 17 (noting email from human resources that Schultz was eligible for severance "due to the reorganization of the team and the new focus your trainers will have"). No reasonable fact finder could conclude that Soo Line substantially changed its

12

proffered reason for terminating Schultz.

### b. No evidence that Soo Line planned to eliminate Schultz's position

Schultz next argues that Soo Line's stated reduction in force is pretextual because the record does not reflect that Soo Line actually intended to reduce its force. However, while not explicitly stated, Soo Line notified employees that substantial changes were planned for the FLM Trainer team as early as June 2013, when Strauss notified the FLM Trainers that they would be finishing with training locations by the end of January 2014 and focus would be shifted from over-the-shoulder to classroom training. Strauss Decl. ¶ 14. Instant messages contemporaneous with that notification reflect that Schultz believed this change would result in positions being eliminated. See Wahl Decl. Ex. B CPLS 0001578 ("There r not enough people to train in the states to have me sit on the payroll to teach a class once a month or less[.]  I have not been in on any classroom planning or prep stuff, I think I know where I stand."); CPLS 0001581 ("[N]ever heard back from [Strauss] about the email I wrote to her asking if I will have a job after the 1st."); Ex. C ("Not enough work. They don't have enough new employees to keep me on every week. They will fly someone in."). Strauss' email of June 16, 2013 confirmed the upcoming changes in the FLM Training team's focus, but stopped short of saying that the entire team would be dissolved. Strauss Decl. Ex. F. Tellingly, Strauss' June 2013 email stated that the restructuring would occur at the end of January 2014, which matches the time of internal discussions among Schultz's supervisors about Schultz's future employment.

Thus, contemporaneous records existing before Schultz's FMLA leave show that a restructuring of the Training team would be completed in or around January 2014, a scene that occurred as scheduled.

### c. Temporal proximity between FMLA request and termination

Schultz next argues that the temporal proximity between his FMLA request and termination creates an inference of discriminatory motivation. "The time lapse between an employee's protected activity and the employer's adverse action is an important factor when evaluating whether a causal connection has been established." McBurney v. Shaw Hansen's Dodge City, Inc., 398 F.3d 998, 1003 (8th Cir. 2005). However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001); see also Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (holding that two months between the protected activity and termination too long). Importantly, "[a]n employee's attempt to prove pretext or actual discrimination requires more substantial evidence [than it takes to make a prima facie case]." Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002) (quoting Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1111 (8th Cir. 2001)).

Schultz completed his FMLA paperwork in early November 2013 and was approved for leave beginning on November 11. Donesky Decl. Exs. Q, R; Phillips Decl. Ex. 27. Schultz was notified of his termination on February 13, 2014, roughly three months after engaging in protected conduct. Thus, standing alone, the temporal proximity between Schultz's FMLA request and his termination is insufficient to create a triable fact issue as to causality.

### d. Reduction in force typically involves more than one layoff

Schultz also argues that because reductions in force "typically involve the layoff of many

employees at once," Soo Line's proffered reason is pretextual. Bellaver v. Quanex Corp., 200 F.3d 485, 494 (7th Cir. 2000). Soo Line has, however, presented sufficient evidence that the decision to terminate Schultz was because its FLM Trainer team, originally a group of eight employees, was going to be restructured. Soo Line has also presented evidence that Schultz's position, and the positions of three other FLM Trainers who left after Schultz was terminated, were never re-filled, leaving only four Trainers on the team. Burley Decl. ¶ 8.

### e. Entitled to reinstatement to another position

Schultz finally argues that Soo Line's stated reason is pretextual for discrimination because it failed to restore Schultz to his former or equivalent position when he returned from FMLA leave. This argument also fails to present a triable issue to pretext because the record reflects Schultz returned to his position after his FMLA leave.[2]

### f. Conclusion

When the record is viewed as a whole, Schultz fails to raise a genuine issue of material fact. The record establishes Soo Line intended to restructure its FLM Trainer team months before Schultz took FMLA leave, and that this restructuring was in place by the end January 2014. Schultz's position was eliminated on February 13, 2014 as a result of the restructuring. Soo Line's motives are additionally supported by the composition of the FLM Trainer team on May 14, 2015, the size of which had been significantly reduced only fifteen months after Soo

---

[2] Schultz cites an email from Human Resources to Burley as evidence that Soo Line had other positions open in the United States that Schultz may have been able to fill. Phillips Decl. Ex. 17. The email is silent as to whether Schultz was qualified for any of the open positions and states that the positions are open "if he can adapt to change." Id. Schultz has not presented any evidence that he was qualified for any of Soo Line's open positions at the time of his termination.

Line indicated changes would occur and at the time Schultz's position was terminated. Further, in determining that Schultz's position would be eliminated in the restructuring, Soo Line considered Schultz's well documented performance deficiencies that predated his request for FMLA leave. Based on this evidence, no reasonable fact finder could conclude Soo Line's decision to terminate Schultz was motivated by Schultz's exercise of his FMLA rights.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 22] is **GRANTED**; and

2. All claims in the Complaint [Docket No. 1-1] are **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


  s/Ann D. Montgomery  
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 24, 2015.